Town of Wellfleet & another[1] *vs.* John W. Glaze.

Barnstable. January 5, 1988 — July 20, 1988.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, Nolan, Lynch, & O'Connor, JJ.

*Seashore. Real Property*, Littoral property. *Shellfish. Municipal Corporations*, Shellfish. *Jurisdiction*, Damage to the environment.

A Superior Court judge was without authority to issue an injunction under
   G. L. c. 214, § 7A, to prohibit the owner of tidal flats from mooring
   three boats on an area of the flats that was licensed to certain other
   individuals for the planting, growing, and taking of shellfish, where the
   major purpose of the statute sought to be enforced, G. L. c. 130, § 67,
   was not to "prevent or minimize damage to the environment." [82-84]
   Wilkins, J., concurring. Abrams, J., dissenting. O'Connor, J., with
   whom Liacos, J., joined, was of the view that jurisdiction exists under
   the Superior Court's general equity powers.
The court expressed the view that it is within the power of the Legislature
   to authorize municipalities to issue licenses to individuals for planting,
   growing, and taking of shellfish on privately owned tidal flats. [84]
Discussion of the nature of public rights with respect to privately owned in-
   tertidal zones. [84-85]
An owner of tidal flats who moored three boats on a portion of the flats that
   was licensed under G. L. c. 130, § 57, to certain individuals for the
   growing of shellfish would not, by such activity, interfere with the
   public's reasonable use of the area for shellfishing. [85-86] O'Connor,
   J., with whom Liacos, J., joins, concurring.

Civil action commenced in the Superior Court Department
on August 8, 1986.

The case was heard by *Francis W. Keating*, J., on a motion
for summary judgment.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

---

[1] The shellfish constable for Wellfleet. We shall refer to the plaintiffs
collectively as the town.

*Edward W. Kirk* for the defendant.

*Elizabeth A. Lane* for the plaintiffs.

*James M. Shannon,* Attorney General, & *James R. Milkey,* Assistant Attorney General, for the Commonwealth, amicus curiae, submitted a brief.

LYNCH, J. The underlying question here is the relative rights of private owners and the public in tidal flats. In August, 1986, the town of Wellfleet filed a complaint in the Superior Court citing the defendant for violating G. L. c. 130, § 67 (1986 ed.), and seeking a restraining order prohibiting the defendant from mooring his boats on a certain "shellfish grant" on a portion of the defendant's flats. The town's request for a temporary restraining order was granted. The town later applied for a preliminary injunction, but its application was denied. Several months later, the town moved for summary judgment on its claim for injunctive relief. The motion was allowed, and an order was entered permanently enjoining the defendant from mooring boats on the grant. The defendant appealed, and we transferred the case here on our own motion.

While the underlying legal issues are complex, they turn on a comparatively simple set of facts. In November, 1983, the town issued a shellfish license on 1.85 acres of tidal flats abutting the defendant's upland[2] on Loagy Bay. The license,

---

[2] It is argued in a footnote to the brief of the amicus curiae that the defendant has not shown that he holds title to the flats in question or that the land covered by the shellfish license is above the mean low tide line. This argument, which appeared in the statement of facts in the amicus brief, was incorporated by reference in the brief of the town. This does not rise to the level of appellate argument within the meaning of Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Commonwealth* v. *Vieira,* 401 Mass. 828, 831 n.4 (1988). Therefore, the question is not before us because the town does not contest these issues. *Samuel Hertzig Corp.* v. *Gibbs,* 295 Mass. 229, 232 (1936). Furthermore, included in the record before the court are deeds in the defendant's name, describing the defendant's land as bounded by the waters of Loagy Bay. Title to the land was registered and confirmed in the Land Court by decree of November 1, 1978, stating that "[t]he land hereby registered is subject to the rights of the public in said Loagy Bay." There is nothing in the record to indicate that title to the tidal flats was ever severed from title to the adjacent uplands. See *Storer* v. *Freeman,* 6 Mass. 435, 437 (1810). Therefore, for purposes of its decision today, the court assumes that title to the flats is in the defendant, subject to the reserved public rights of fishing, fowling, and navigation.

issued pursuant to G. L. c. 130, § 57 (1986 ed.),[3] authorized certain individuals to plant, grow, and take shellfish within the area covered by the license. The shellfish, specifically quahogs and oysters, are raised in frame structures known as "growout pens," which are covered by a plastic mesh.

Since 1972, the defendant has moored a thirty-foot catamaran, a nineteen-foot flat-bottomed sailboat, and a sixteen-foot outboard motor boat in the area now subject to license. At low tide, the three boats rest directly on the tidal flat, killing or endangering some of the shellfish and tearing the mesh covering the growout pens. In June and July of 1986, the town's shellfish constable observed the three boats moored in the licensed area and requested the defendant to remove them. The defendant refused, whereupon the town brought this action, claiming that the defendant had violated G. L. c. 130, § 67,[4] and seeking an injunction.

---

[3] General Laws c. 130, § 57, in pertinent part, states: "The city council of a city or the selectmen of any town may, upon written application therefor and after public notice and hearing thereon as provided in section sixty, grant to any person a license for a period not exceeding ten years to plant, grow, and take shellfish and to plant cultch for the purpose of catching shellfish seed, in such city or town at all times of the year, in, upon or from a specific portion of flats or land under coastal waters, provided the division of marine fisheries shall, after inspection, certify that the license and operation thereunder would cause no substantial adverse effect on the natural shellfish resources of the town, and provided further, no license shall be issued for any area then or within two years prior thereto, closed for municipal cultivation under the provisions of section fifty-four. Licenses under this section shall be issued upon forms supplied by such cities and towns and upon such terms and conditions and subject to such regulations as the city council or selectmen issuing the same shall deem proper, but not so as to impair the private rights of any person or to materially obstruct navigable waters, and they shall describe by metes and bounds the waters, flats or creeks covered thereby."

[4] General Laws c. 130, § 67, states: "Whoever works a dredge, oyster tongs or rakes, or any other implement for the taking of shellfish of any description upon any shellfish grounds or beds covered by a license granted under section fifty-seven or corresponding provisions of earlier laws, or in any way disturbs the growth of the shellfish thereon, or whoever discharges any substance which may directly or indirectly injure the shellfish upon any such grounds or beds, without the consent of the licensee or transferee, as the case may be, or whoever, while upon or sailing over any such grounds or beds, casts, hauls, or has overboard any such dredge,

The right to use tidal flats has long been regulated by the Colonial Ordinance of 1641-1647. Under the Colonial Ordinance, in order to encourage construction of private wharves, littoral owners were granted title to the shore as far as mean low tide mark or one hundred rods from the mean high tide mark, whichever is less.[5] Reserved from the grant, however, were rights in the public to free fishing, fowling, and navigation. *Commonwealth* v. *Alger*, 7 Cush. 53, 67-68 (1851). In effect, the public reserved a kind of easement over the land. See *Opinion of the Justices*, 365 Mass. 681, 685 (1974) ("the ordinance is properly construed as granting the benefitted owners a fee in the seashore to the extent described and subject to the public rights reserved"); *Commonwealth* v. *Alger*, *supra* at 77, citing *Storer* v. *Freeman*, 6 Mass. 435 (1810) ("the flats are held by the riparian proprietor, subject to an easement").

The defendant argues that the town exceeded the bounds of the public easement by issuing the shellfish license. He claims that the effect of that license is to take his property without compensation. The town responds that issuing the shellfish license was simply a valid exercise of the legislative power to regulate the public's right to fish. The court need not decide those claims, however, because the court concludes that the Superior Court lacked authority to enjoin the defendant's activities.

1. *Authority to issue the injunction.* The town asserts that the Superior Court's authority to issue an injunction in this case is conferred by G. L. c. 214, § 7A (1986 ed.), which states in pertinent part: "The superior court for the county in

---

tongs, rake or other implement for the taking of shellfish of any description, under any pretence or for any purpose whatever, without the consent of the licensee or transferee, as the case may be, shall for the first offence be punished by a fine of not more than twenty dollars or by imprisonment for not more than one month, and for a subsequent offence by a fine of not more than fifty dollars or by imprisonment for not more than six months."

[5] For a more detailed account of the history of the Colonial Ordinance and littoral rights in Massachusetts, see generally *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 631-634 (1979); *Opinion of the Justices*, 365 Mass. 681, 684-686 (1974).

which damage to the environment is occurring or is about to occur may, upon a civil action in which equitable or declaratory relief is sought . . . by any political subdivision of the commonwealth, determine whether such damage is occurring or is about to occur and may, before the final determination of the action, restrain the person causing or about to cause such damage; provided . . . that the damage . . . constitutes a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment." Thus for the matter to be properly before the Superior Court this action must have been one in which equitable or declaratory relief was sought because (1) damage to the environment was occurring or about to occur, and (2) that damage constituted a violation of a statute, the major purpose of which is to prevent or minimize damage to the environment.[6]

The town has not demonstrated that the the major purpose of G. L. c. 130, § 67, is to prevent or minimize damage to the environment. Although protection of shellfishing undoubtedly provided some motivation for the enactment of the statute (see 1909 H.R. Doc. No. 1320, Report on the Mollusk Fisheries of Massachusetts, which speaks of shellfish as a State asset and which proposes the system of private licensing now at issue to cure the "almost complete exhaustion" of the shellfish supply "in certain areas." *Id.* at 4, 6[7]), it cannot be that the major purpose behind § 67 is the protection of the environment because it is the consent of the licensee that determines whether the conduct described is within the statutory sanction. If the Legislature in enacting § 67 was primarily motivated by a desire to protect the natural resources of the Commonwealth, it surely would not have limited the statutory sanction only to acts done without the licensee's permission.

[6] The town does not rely on the general equity power of the Superior Court, and we do not address that issue.

[7] Protection to the licensee is also afforded by G. L. c. 130. Section 63 grants licensees a tort remedy with treble damages against any person who digs, takes or disturbs the shellfish in the area described in the license.

Therefore, the court concludes that the major purpose leading to the enforcement of § 67 is not to prevent or minimize damage to the environment, and that authority to issue an injunction was thus not conferred by G. L. c. 214, § 7A. However, since this appeal presents issues of significant public concern, the court makes some additional comments.

2. *Authority to issue shellfish license.* Section 57 of G. L. c. 130 authorizes the selectmen of a town, after notice and hearing, to "grant to any person a license for a period not exceeding ten years to plant, grow, and take shellfish . . . in, upon or from a specific portion of flats or land under coastal waters." Section 67 goes on to say that "[l]icenses under this section shall be issued . . . so as [not] to impair the private rights of any person . . . ." Thus, the statute only authorizes the town to issue a license upon privately held flats, so long as no taking or other impairment of private rights results.[8]

The public right to fish includes the right to dig for shellfish. *Commonwealth* v. *Howes*, 270 Mass. 69, 73 (1930). See *Proctor* v. *Wells*, 103 Mass. 216, 217 (1869); *Weston* v. *Sampson*, 8 Cush. 347, 355 (1851). The Legislature may enact reasonable regulations appurtenant to that public right, including granting exclusive fishing rights to particular individuals. *Commonwealth* v. *Hilton*, 174 Mass. 29, 33 (1899) (Legislature may grant exclusive fishing rights). *Weston* v. *Sampson*, *supra* at 352-353 (Legislature may regulate and abridge public right of fishing in tidal flatlands). Therefore, the court concludes that it is within the power of the Legislature to authorize towns to issue licenses for shellfishing on privately owned tidal flats.

3. *Relative rights of the parties in the licensed area.* However, the conclusion that the town had the authority to issue a license for shellfishing on the defendant's flats does not dispose of the question whether, in mooring boats on the area of the shellfish grant, the defendant illegally encroached upon rights reserved to the public.

---

[8] The court expresses no opinion as to whether a license to conduct aquaculture on privately owned flats comports with statutory limitations on the rights of a licensee.

"We have frequently had occasion to declare the limited nature of public rights in the seashore." *Opinion of the Justices*, 365 Mass. 681, 687 (1974), and cases cited. While the public clearly has the right to take shellfish on tidal flats, there is no general right in the public to pass over the land, *id.*, or to use it for bathing purposes. *Butler* v. *Attorney Gen.*, 195 Mass. 79 (1907). Nor may the public take soil or seaweed resting on the soil of the flats. See *Anthony* v. *Gifford*, 2 Allen 549 (1861) (seaweed); *Porter* v. *Shehan*, 7 Gray 435 (1856) (soil). Compare *Austin* v. *Carter*, 1 Mass. 231 (1804) (owner may exclude others by building on flats), with *Commonwealth* v. *Alger*, 7 Cush. 53, 89 (1851) (owner's right to build wharf subject to reasonable regulation by Legislature). In close parallel with this case, it has been held that there was no liability in trespass for interference with the part of a fishing weir the plaintiff placed on tidal flats adjoining the land. *Locke* v. *Motley*, 2 Gray 265, 266 (1854). The court noted, in dictum, that it doubted whether the plaintiff had any right to fix stakes in the riparian owner's land for the purposes of securing the weir. *Id.* at 267.

These authorities indicate that, while the public clearly retains the right of fishing in the intertidal zone, that right is far from unqualified. As Chief Justice Shaw commented in the course of discussing the reserved public right of navigation, "[l]ooking at the terms of this law, and the purposes for which it was intended, the object seems to have been, to secure to riparian proprietors in general, without special grant, a property in the land . . . subordinate only to a *reasonable* use of the same, by other individual riparian proprietors and the public, for the purposes of navigation . . . " (emphasis added). *Commonwealth* v. *Alger*, 7 Cush. 53, 89 (1851). The Chief Justice also noted that regulations proscribing interference with the public right should state precisely what constitutes forbidden activity in order to pass the test of reasonableness. *Id.* at 96 ("An authoritative rule, carrying with it the character of certainty and precision, is needed").

The defendant has the right to use the land in a manner not inconsistent with the public's reasonable use of the area for

shellfishing. The allegations of this complaint, however, are that the defendant interfered with the practice of aquaculture on the flats and with pens and mesh used in that practice. A license issued in accordance with § 57 of G. L. c. 130, however, must not "impair the private rights of any person." The mooring of his boats by the defendant in this case is not such an exercise of his right to use the land as to constitute an interference with the public's reasonable use of the area for shellfishing. The court does not decide the extent to which public rights may lawfully restrict an owner's use of all or part of his flats for mooring of recreational boats.

Accordingly, the court concludes that the Superior Court lacked authority to enjoin the defendant's activities. The judgment is reversed, and a new judgment will enter in the Superior Court dismissing the action.

*So ordered.*

WILKINS, J. (concurring). I agree with the court's opinion and write separately only to disassociate myself from any implication in the opinion that the harm inflicted on the shellfish necessarily involved "damage to the environment," as defined in G. L. c. 214, § 7A (1986 ed.). The circumstances that § 7A specifically states constitute damage to the environment involve adverse effects on the air, water, or land. The direct infliction of harm on living things (animal or vegetable) may generally lie outside the range of damage to the environment expressed within § 7A.

O'CONNOR, J. (concurring, with whom Liacos, J., joins). I disagree with the court's dismissal of the action on jurisdictional grounds. In my view, the Superior Court properly assumed jurisdiction under its general equity powers. However, on the merits, the town has demonstrated no right to the injunction it seeks. I therefore join in reversing the grant of summary judgment to the town.

*Jurisdiction.* The court concludes that jurisdiction is lacking under G. L. c. 214, § 7A (1986 ed.). However, whether or not G. L. c. 214, § 7A, provides jurisdiction, jurisdiction exists under the Superior Court's general equity powers. In *Commonwealth* v. *Stratton Fin. Co.*, 310 Mass. 469, 472-474 (1941), the court said that, while our decisions have generally been hostile to the enforcement of criminal statutes through injunctions, this hostility has existed only "in cases involving criminal acts *not* amounting to a true public nuisance in the conventional sense and *not* involving the use of or injury to public or private property, *encroachments upon public easements* and the like, and when the statute itself does not confer equity jurisdiction" (emphasis added). *Id.* at 473. Thus, in *Attorney Gen.* v. *Jamaica Pond Aqueduct Corp.*, 133 Mass. 361, 364 (1882), the court held that the Attorney General could maintain an action in equity to protect the public's fishing, boating, and other rights in the great ponds of the Commonwealth, because these rights "are regarded as valuable rights, entitled to the protection of the government." See *Attorney Gen.* v. *Williams*, 174 Mass. 476, 483 (1899), *S.C.,* 178 Mass. 330 (1901), aff'd, 188 U.S. 491 (1903) (Attorney General allowed to maintain a suit in equity to enforce a public easement in open air space in Copley Square). As the court properly notes, *ante* at 82, the public fishing, fowling, and navigation rights in the defendant's tidal flats are essentially a public easement over the defendant's land. Furthermore, although the general public's shellfishing rights in the defendant's tidal flats are presently exercised exclusively by a private party, the licensee under G. L. c. 130, § 57 (1986 ed.), his license is granted to serve the public interest in replenishing the shellfisheries, not for the private benefit of the licensee. See *Commonwealth* v. *Hilton*, 174 Mass. 29, 33 (1899) (it is not to be assumed that the Legislature would grant exclusive fishing rights except to promote the public interest). See also G. L. c. 130, § 65 (1986 ed.) (§ 57 license to be forfeited for deficiency in planting, producing, or marketing shellfish). Thus, the proper public entity has the right to maintain a suit in equity to preserve the public's fishing rights in this case.

The question then becomes whether the town is the proper party to enforce the public's rights. Private interference with the public's easement is treated in equity as a public nuisance, *Attorney Gen.* v. *Williams, supra,* and the Attorney General is generally the proper person to procure the abatement of a public nuisance, see *Massachusetts Soc'y of Optometrists* v. *Waddick,* 340 Mass. 581, 585-586 (1960). However, municipalities have been allowed to maintain an action to enjoin public nuisances either where a town has sustained special or peculiar damage in its corporate capacity, *Dartmouth* v. *Silva,* 325 Mass. 401, 404 (1950), or where "the regulation of the subject matter has been entrusted to the officers of a municipality, the inhabitants of which are peculiarly interested, and the wrongdoing alleged consists of a violation of the rules and orders of those officers," *Mayor of Cambridge* v. *Dean,* 300 Mass. 174, 175-176 (1938).

The town has standing in this case under the rule set forth in *Mayor of Cambridge* v. *Dean, supra.* Under G. L. c. 130, § 57, as appearing in St. 1941, c. 598, § 1, private shellfish licenses are granted by town officials "upon such terms and conditions and subject to such regulations as the [town officials] issuing the same shall deem proper." Further, "[t]he Legislature has consistently recognized that local municipalities 'have a peculiar interest' in protecting the shellfish resource," *Barlow* v. *Wareham,* 401 Mass. 408, 411 (1988), quoting *Commonwealth* v. *Bragg,* 328 Mass. 327, 331 (1952). Thus, although the town is asserting that the defendant is violating a State statute, G. L. c. 130, § 67, rather than a local ordinance or regulation, this does not defeat the suit. The State criminal statute essentially enforces the license issued by the municipality under § 57. Where, as here, a town is attempting to protect the cultivation of shellfish under a town-granted license, the town should have standing to maintain the action. If disregard of the order of a town officer is required as well, see *Mayor of Cambridge* v. *Dean, supra,* the town's verified complaint alleges that the defendant refused to comply with oral and written cease and desist orders issued by the town shellfish constable. Compare the facts and holding of *Mayor of Cam-*

*bridge* v. *Dean*, where the mayor of Cambridge was held not to have standing to seek an injunction against the operation of a piggery under the jurisdiction of the board of health of Lincoln. Therefore, I would hold that the court below had general equity jurisdiction to hear this matter, and that the town is a proper party to maintain this suit.

*The merits.* Under G. L. c. 130, § 57, licenses granted to private parties to plant, grow, and take shellfish shall not "impair the private rights of any person." The town asserts that, even if the defendant is the owner of the tidal flats, see *ante* at 80 note 2, no private right of the defendant is impaired because the mooring of the defendant's boats on the shellfish grant illegitimately interferes with the reserved public rights in fishing.

However, the public right to fish is not implicated in this case. The town has not alleged any interference with the licensee's attempts to shellfish. Rather, it has alleged interference with the practice of certain types of aquaculture on the defendant's property, that is, with the planting and growing of oysters and quahogs, the latter in pens covered with plastic mesh, on the defendant's tidal flats. "We have frequently had occasion to declare the limited nature of public rights in the seashore." *Opinion of the Justices*, 365 Mass. 681, 687 (1974), and cases cited. The public has reserved only the rights of fishing, fowling, and navigation, and any "natural derivative" thereof. *Id.* at 685-686. "Except as against public rights . . . the private ownership is made perfect . . . ." *Id.* at 686, quoting *Butler* v. *Attorney Gen.*, 195 Mass. 79, 83 (1907). The public's "right of fishing [is] a public right to take the fish . . . whether moving in the water or imbedded in the mud covered by it." *Proctor* v. *Wells*, 103 Mass. 216, 217 (1869).

Aquaculture is not fishing, nor can it legitimately be considered a "natural derivative" of the right to fish, any more than breeding game animals on someone else's land could properly be considered a "natural derivative" of the right to hunt there. Thus, whatever right the public has to interfere with the private property rights of coastal owners for purposes "reasonably related" to the promotion of fishing as well as navigation, see

*Opinion of the Justices, supra* at 686; cf. *Crocker* v. *Champlin*, 202 Mass. 437, 441 (1909) (public has right to control property so far as is "reasonably necessary" for navigation), but see *Opinion of the Justices, supra* at 687 ("littoral owner may build on his tidal land so as to exclude public completely as long as he does not unreasonably interfere with navigation"); *Locke* v. *Motley*, 2 Gray 265 (1854) (owner could drive stakes into his flats even if they obstructed fishing by inhabitants of town), turning the tidal flats in which this defendant apparently owns the fee into a shellfish farm is too great an extension of the public's right of "free fishing" to be "reasonably related" to that right. Cf. *Porter* v. *Shehan*, 7 Gray 435 (1856) (member of public could take shellfish from tidal flats, but not surrounding soil, except such soil as would necessarily be attached to the shellfish); *Opinion of the Justices, supra* (public right to navigation does not include right of passage over dry land); *Butler* v. *Attorney Gen.*, 195 Mass. 79, 84 (1907) (public right to navigation does not include right to bathing on the beach; public has right to pass through the water "without any use of the land underneath"). Compare *Barry* v. *Grela*, 372 Mass. 278 (1977) (public has right to cross tidal flats to reach public jetty in order to fish from jetty); *Locke* v. *Motley, supra* at 267 (common right of fishing would not give plaintiff the right to fish by a method requiring the fixing of plaintiff's stakes in defendant's flats unless that method was needed to exercise the fishery rights).

Simply put, the right to fish cannot reasonably be construed to include the right to plant, cultivate, and propagate fish on the defendant's tidal flats. Because there is no such reserved public right, the town is not entitled to an injunction restraining the defendant from mooring his boats on Shellfish Grant 783. I would hold that the Superior Court has jurisdiction over this action, but that the town has demonstrated no right to an injunction.

ABRAMS, J. (dissenting). In my view, jurisdiction is proper in this case in the Superior Court under G. L. c. 214, § 7A (1986

ed.). On the merits, I think that the town is not entitled to summary judgment and that the matter should be remanded for trial with the licensee joined as a necessary party.

1. *Jurisdiction.* The narrow interpretation of G. L. c. 214, § 7A, adopted today is inconsistent with the broad remedial purpose of that statute. In *Boston* v. *Massachusetts Port Auth.*, 364 Mass. 639, 646 (1974), this court wrote: "The legislative intent underlying [§ 7A] is broadly stated in the title under which it was enacted: 'An Act establishing a cause of action in behalf of certain persons and political subdivisions for the purpose of protecting the natural resources and environment of the commonwealth.' St. 1971, c. 732. . . . We believe that these broad statements of purpose are incompatible with a narrow, technical interpretation of [§ 7A] which would limit the operation of the statute to the enforcement of only prohibitory environmental laws and regulations." See also *Cummings* v. *Secretary of Envtl. Affairs*, 402 Mass. 611, 619 (1988) (Abrams, J., dissenting).

General Laws c. 130, § 67 (1986 ed.), imposes penalties on any activity "which may directly or indirectly injure the shellfish upon any [shellfish] grounds or beds," without the consent of the person licensed to oversee and manage "the natural shellfish resources of the town." See G. L. c. 130, § 57 (1986 ed.). In my view, § 67 is a statute "the major purpose of which is to prevent or minimize damage to the environment" within the broad meaning of G. L. c. 214, § 7A. I therefore conclude that the violation of § 67 alleged in this case satisfies the jurisdictional requirements of § 7A.

2. *Merits.* I agree with Justice O'Connor that the town is not entitled to summary judgment. However, I think it is inappropriate for this court to determine the issues in this case in the first instance.

Assuming, without deciding, that the town may grant a license to conduct "aquaculture" without violating the rights of landowners,[1] the central issue for trial is whether the license

---

[1] I agree with the court that it is inappropriate on the present record to determine whether "aquaculture" may be considered "fishing" within the meaning of the Colonial Ordinance. See *ante* at 84 note 8.

in this case necessarily prohibits the defendant from mooring his boats properly in an appropriate place on his tidal flats. If so, then the shellfish license granted by the town may be invalid, because G. L. c. 130, § 57, provides that such licenses shall not "impair the private rights of any person." However, if it were determined that the scope of the license could be limited to allow the defendant to moor his boats, then the license may be valid. Because the scope and validity of the license are in issue, it would be unfair to decide this case without joining the licensee as a necessary party. See Mass. R. Civ. P. 19 (a), 365 Mass. 765 (1974).