Garsh, J.
The plaintiffs brought this suit to prevent the City of Attleboro (“the City”) from selling a portion of a parcel of land located in the Locust Valley to a private corporation for expansion of a golf course. This matter is before the court on the defendants’ motion for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons discussed below, the defendants’ motion is allowed with respect to Count I of the Amended Complaint and denied with respect to Count II.
BACKGROUND
The undisputed facts as contained in the summary judgment record are as follows.
In 1994, the Resolution Trust Corporation (“RTC”), as the receiver of Old Stone Federal Savings Bank (“the Bank”), was the owner of 325 acres of land located in the City of Attleboro in the area known as Locust Valley. The Bank had acquired title to the 325 acres by foreclosing on a mortgage to a developer who had been seeking approval of a residential subdivision plan for the construction of200 to 300 single-family homes. RTC planned to market the 325 acres of land for sale. Because the City was concerned about the financial burden such a potentially large residential development would place on municipal services and schools, the City offered to purchase the entire 325-acre tract for $1,800,000. RTC rejected its offer and made a counteroffer of $2,150,000, a sum that the City could not afford. Thereafter, RTC and the City entered into an extended period of negotiations over the land.
Beginning in March of 1995, the City developed a plan to divide the 325-acre tract into two parcels in order to accomplish both the RTC’s price objective and the City’s desire to reduce residential development and use as much of the land as possible for recreation and open space. Under the City’s plan, the City would purchase 132 acres of the tract (“Parcel A") and use it for recreation and open space, while the remaining 193 acres (“Parcel B”) would be sold to a private developer. Parcel B contained an existing nine hole golf course open to the public, known as Locust Valley, owned and operated by a private corporation, KAADD, II Ltd. (“KAADD”). The City’s plan contemplated that 121 acres of Parcel B, including the area where the golf course was located, would be restricted to recreational use while the remaining 72 acres would be available for development. The City’s preference for the 72 acres on Parcel B was for the golf course to be expanded to eighteen holes, with fewer than 64 homes built.
One difficulty with the City’s plan was that a portion of Parcel B designated for the development of some of the 64 residential lots (“the Form A lots") also contained parts of three existing golf holes, a putting green, the club house and the parking lot. To address this problem, RTC and the City agreed that the City would make a portion of Parcel A available to the purchaser of Parcel B to compensate for the part of the golf course that would be displaced by the development of the Form A lots. The Ciiy also agreed to grant easements on Parcel A to accomplish the development of the eighteen hole golf course. The City engaged an engineering firm to develop a concept plan for Parcel *502 B showing the areas to be developed and the areas that could not be developed.
On April 18, 1995, the Attleboro City Council voted to appropriate $650,000 “for the acquisition of 132 acres of land in the area known as Locust Valley for public domain.” The Mayor approved and signed this vote on April 26. By letter dated June 6, 1995, the City offered to purchase Parcel A from RTC for $647,000; RTC subsequently indicated that it would accept this offer upon the conditions that it could sell Parcel B at a price that would allow it to achieve its price objective and that the City would make part of Parcel A available to the purchaser of Parcel B to relocate golf holes that would be displaced by development of the Form A lots. RTC then put Parcel B out to public bid. On October 31, 1995, in reliance on the City’s concept plan, KAADD agreed to purchase Parcel B from RTC for' $1,382,657.
On November 30, 1999, at the City’s request, University of Massachusetts Wildlife Biologist Scott Jackson (“Jackson”) visited 154 acres of the Locust Valley tract. Thereafter, he reviewed materials provided by the Attleboro Planning Department and prepared a report entitled, “A Preliminary Ecological Assessment of City of Attleboro Land in the Locust Valley” (“the Assessment”). The Assessment states that its purposes are to describe the natural communities occurring on the property, to identify any rare or unusual natural communities, to identify areas of particular value for wildlife and biodiversity protection, to assess the overall significance of the property in terms of wildlife and biodiversity protection, and to discuss options and make recommendations concerning conservation of wildlife habitat and biodiversity. The Assessment explicitly states that it is not an exhaustive natural resource inventory, an inventory of state/federally listed species occurring on the property, or a detailed wildlife habitat evaluation for any regulatory purpose.
The Assessment states that the Locust Valley property is comprised of upland oak forest interspersed with forested wetlands and vernal pools, and opines that, although the oak forest community is not rare or uncommon in Massachusetts, it is particularly valuable as habitat for wildlife. With respect to the forested wetlands, the Assessment states that some of the wetlands may be suitable for nesting habitat for the four-toed salamander, a state-listed species, although none have been documented on the property. Further, the northeastern corner of the site contains forested wetlands dominated by green ash and swamp white oak, which the Assessment concludes “is an unusual and valuable natural community and should be a priority for conservation." With respect to six vernal pools on the property, the Assessment states that several state-listed species tend to use vernal pools as breeding habitat. The Assessment concludes that long-term protection of the vernal pools would require protecting most of the site and possibly land abutting the site to the east and west, and recommends that an inventory of the vernal pools be conducted to determine which species utilize these pools. Finally, with respect to the forest interior, the Assessment states that the Locust Valley property “is probably highly used by forest interior birds” and concludes that development of the property “has strong potential to fragment the forest resulting in significant reductions in habitat values on the site as well as on surrounding land.”
On December 1, 1995, the City purchased Parcel A from RTC for $647,000 and the land was conveyed to the City that day subject to the deed restriction “that no portion thereof shall be used for any purpose other than recreational, park and conservation purposes duly authorized by the City of Attleboro.” The deed states that this restriction is for the benefit of the remaining 193 acres of Parcel B land. On December 1, 1995, the City also entered into a formal agreement with RTC requiring the City “to make its best efforts to make such land available from Parcel ”A" to the third-party purchaser [of Parcel “B”), its successors or assigns, as third-party purchaser, its successors or assigns, may require to relocate those golf holes, or parts thereof, displaced by development of [the] Form A lots."
On March 27, 1996, RTC conveyed Parcel B to KAADD subject to a restriction that 121 acres of Parcel B, the area where the nine hole golf course was located, would be used as a golf course or a reconfiguration of the golf course or for other recreational purposes. The remaining 72 acres of Parcel B remained open for development or, as preferred by the City, expansion of the nine hole golf course to an eighteen hole course, coupled with development of fewer houses.
In August of 1998, KAADD requested that the City convey to it a 16.9-acre portion of Parcel A so that KAADD could put more distance between two of the fairways in order to increase golfer safety. The City conveyed the 16.9 acres to KAADD on October 22, 1998 for $22,000. Approximately half of the acreage conveyed is unusable wetlands and only three acres of this land was actually used in the design of golf holes.
In June of 1999, KAADD wrote to the City and indicated its interest in purchasing additional land from Parcel A in order to build the golf holes that would be displaced by the residential development of the Form A lots. In addition, the City’s engineering concept plan had mistakenly and substantially understated the extent of wetlands on Parcel B. The true extent of the wetlands prevented KAADD from either building a championship eighteen hole golf course of Professional Golf Association caliber or from fully developing the maximum number of house lots. The Mayor requested that the City Council declare 42.5 acres of Parcel A (“the Tract”) as surplus available for sale. In response, *503 on November 23, 1999, the City Council voted to declare the Tract surplus and voted to maintain the rest of Parcel A as open space free from organized recreation or any other type of development. An advertisement was published in the Attleboro Sun Chronicle requesting bids for the purchase of the Tract subject to the restriction that it be used only for recreational, park and conservation purposes. Bids were to be submitted to the Mayor’s Office by January 10, 2000. The only proposal submitted was by KAADD, which offered to purchase the Tract for $321,600 and use it to expand its golf course.
On January 31, 2001, the plaintiffs filed the present complaint for equitable and declaratory relief pursuant to G.L.c. 214, §7A, alleging that the sale of the Tract to KAADD will cause significant, severe and permanent environmental damage. The City did not receive prior written notice by certified mail from the plaintiffs alleging violation of a statute or regulation intended to prevent or minimize environmental damage. On August 10, 2001, the plaintiffs filed an amended complaint alleging in Count I that the sale of the Tract to KAADD violates G.L.c. 214, §7A because the expansion of the golf course poses a significant danger to the land from the run off of chemicals used on the course and endangers the unique fauna and flora in the area, including rare wildlife using vernal pools as their habitat. Count II of the Amended Complaint alleges that the sale of the Tract to KAADD would violate Article 49 of the Articles of Amendment to the Massachusetts Constitution.
Construction of the expanded eighteen hole golf course has not begun and will not begin until KAADD obtains all applicable environmental permits and approvals. Freeman Engineering Company (“Freeman”) is a professional surveying and engineering company which provides consulting services with respect to property surveys, subdivisions, and civil, sanitary and environmental engineering. KAADD has employed Freeman to advise it concerning its development of Parcel B and the expansion of the existing nine hole golf course. Freeman has concluded that before KAADD can construct the eighteen hole golf course, it will need to obtain a special permit from the Attleboro Zoning Board of Appeals. In addition, KAADD must file a notice of intent with the Attleboro Conservation Commission and the Southeast Regional Office of the Department of Environmental Protection (“DEP”), as well as notify the Natural Heritage Endangered Species Program. KAADD will have to obtain a permit and order of conditions from the Attleboro Conservation Commission, as well as water withdrawal and sewer extension permits from DEP. KAADD must also obtain a National Pollutant Discharge Elimination System Permit from the United States Environmental Protection Agency.
DISCUSSION
The defendants move for summary judgment on Count I of the Amended Complaint on the ground that the plaintiffs have no reasonable expectation of demonstrating entitlement to equitable relief under G.L.c. 214, §7A, which provides in relevant part:
The superior court for the county in which damage to the environment is occurring or is about to occur may, upon a civil action in which equitable or declaratory relief is sought in which not less than ten persons domiciled within the commonwealth are joined as plaintiffs . . . determine whether such damage is occurring or is about to occur and may, before the final determination of the action, restrain the person causing or about to cause such damage; provided, however, that the damage caused or about to be caused by such person constitutes a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment.
For purposes of this statute, the term "person” includes “the commonwealth or any political subdivision thereof.” G.L.c. 214, §7A . The superior court has authority to grant relief under G.L.c. 214, §7A only if the plaintiffs meet their burden of showing that damage to the environment is either occurring or is about to occur. Walpole v. Secretary of the Executive Office of Environmental Affairs, 405 Mass. 67, 71 (1989); Wellfleet v. Glaze, 403 Mass. 79, 83 (1988); Warren v. Hazardous Waste Facility Site Safety Council, 392 Mass. 107, 118 (1984). Section 7A of the statute defines “damage to the environment,” in relevant part, as:
any destruction, damage or impairment, actual or probable, to any of the natural resources of the commonwealth . . . Damage to the environment shall include, but not be limited to, air pollution, water pollution, improper sewage disposal, pesticide pollution, excessive noise, improper operation of dumping grounds, impairment and eutrophication of rivers, streams, flood plains, lakes, ponds or other water resources, destruction of seashores, dunes, wetlands, open spaces, natural areas, parks or historic districts or sites. Damage to the environment shall not include any insignificant destruction, damage or impairment to such natural resources.
The defendants are correct that the present summary judgment record fails to raise a genuine issue of material fact with respect to whether damage to the environment is occurring or is about to occur as a result of the sale of the Tract to KAADD. The plaintiffs rely heavily on the preliminary ecological assessment prepared by Jackson to prove their allegation that the sale of the Tract will cause environmental damage to occur. The Assessment, which does not specify whether the 154 acres visited by Jackson were on Parcel A or Parcel B or both or whether any of the 154 *504 acres he visited included the Tract proposed to be conveyed by the City to KAADD, primarily contains generalities about the various habitats present in the Locust Valley and expresses the opinion that the area is a valuable natural resource which should be preserved. Although the Assessment concludes that any development of the area has a potential for habitat destruction, it does not purport to analyze the environmental impact of KAADD’s expansion of the golf course in particular. Moreover, insofar as the plaintiffs cite the Assessment to support their allegation that state-listed species will be endangered by the golf course, the Assessment merely states that there might be such species living in the Locust Valley and that an actual inventory of species is needed.
The plaintiffs further rely on an August 1999 article entitled, “Golf Courses and the Environment” au-' thored by John J. Clarke, the Director of the Massachusetts Audubon Society Advocacy Department. This article articulates the Society’s position that the development of golf courses generally destroys open natural space and has detrimental environmental effects including fragmentation of habitat, replacement of natural plant and animal-communities with artificial and intensively managed land, and contamination of natural habitat by pesticide application and runoff.
The article does not purport to evaluate the environmental impact of any particular golf course, and does not specifically address the Locust Valley property at issue in this case. Accordingly, the article is not probative of whether as a result of the sale of the Tract to KAADD, damage to the environment is occurring or is about to occur.
Further, the other materials submitted by the plaintiffs do not constitute competent evidence admissible at trial which this Court can consider for purposes of summary judgment. An opposition to a well-pleaded motion for summary judgment must be predicated on admissible evidence which shows the existence of a dispute of material fact. Mass.R.Civ.P. 56; Quigley v. Bay State Graphics, Inc., 427 Mass. 455, 459 (1998). The plaintiffs rely on the affidavit of plaintiff David Perry, a graduate of the Stockbridge School of the University of Massachusetts with a major in turf management who has studied golf course development. Perry states that “[f]rom news reports and from observations on my part and that of others, KAADD was prepared upon the consummation of the sale of the 42 acres to commence construction which would have resulted in immediate, severe and irreparable damage to the environment and ecosystem of not only the 42-acre parcel of land but to the remaining Locust Valley tract which was dedicated to remain as undeveloped conservation land.” Perry’s affidavit does not show sufficient personal knowledge to render this conclusion admissible, nor does the affidavit establish a sufficient foundation to allow Perry to offer his opinion as an expert. Bare assertions and conclusions in an affidavit which are unsupported by personal knowledge cannot be used to forestall summary judgment. Polaroid Corp. v. Rollins Environmental Services (NJ), Inc., 416 Mass. 684, 696 (1993); Dattoli v. Hale Hospital, 400 Mass. 175, 178 (1987).
Perry’s affidavit further states that hydrologist Arnold O’Brien (“O’Brien”) will testify at trial in conformity with a Hydrogeologic Analysis of the Locust Valley Tract performed on January 14, 2000. However, the plaintiffs did not submit an affidavit from O’Brien himself.[4] A party opposing summary judgment is not entitled to rely on general allegations of expected proof at trial. Community Nat’l Bank v. Dawes, 369 Mass. 550, 555-56 (1976); John B. Deary, Inc. v. Crane, 4 Mass.App.Ct. 719, 724 (1976). Although the hydrogeologic analysis is attached to Perry’s affidavit, it is not accompanied by any affidavit verifying it or demonstrating its admissibility into evidence.
More importantly, even if the plaintiffs’ submissions establish probable environmental damage as the result of the expansion of the golf course, they do not demonstrate, as required by G.L.c. 214, §7A, that such damage “is occurring or is about to occur” as a result of the action at issue in this case: the City’s sale of the Tract to KAADD. The transfer to KAADD of the title to 42.5 acres, a paper transaction, will not itself cause any environmental damage. Rather, it is the anticipated use of that land for the expansion of the golf course by KAADD which presents the possibility of such harm. The plaintiffs’ contention that “if the sale is made from the City to KAADD, the blade of the bulldozer [stands] ready to unleash the environmental holocaust which the plaintiffs seek to protect from occurring” is nothing more than hyperbole. It is undisputed that, prior to commencing any work on the golf course, KAADD must obtain zoning relief from the Attleboro Zoning Board of Appeals as well as numerous environmental permits and approvals from the Attleboro Conservation Commission, DEP and EPA. The change in ownership of the Tract will not occasion imminent environmental damage, and the plaintiffs will be able to avail themselves of several opportunities before agencies charged with preventing or minimizing environmental harm to ensure that the feared “environmental holocaust” does not occur. See Walpole v. Secretary of the Executive Office of Environmental Affairs, 405 Mass. at 71 (concluding that environmental damage was not “about to occur” under G.L.c. 214, §7A where a proposed wastewater treatment plant was only at the stage where environmental impact studies were being performed); Warren v. Hazardous Waste Facility Site Safety Council, 392 Mass. at 118 (concluding that environmental damage was not “about to occur” under G.L.c. 214, §7A where a proposed hazardous waste facility was still in the early stages of the siting process); Hootstein v. Coxe, 5 Mass. Law. Rptr. No. 27, 620, 622 (October 7, 1996) (Murphy, J.) (concluding that the proposed expansion of a sludge treatment plant was not about to cause environmental *505 damage under G.L.c. 214, §7A where any expansion would have to be preceded by permit reviews and approval of several governmental bodies). Cf. Collora v. Newton Conservation Commission, 1995 WL 1146116 at *2 (Mass. Sup. Ct. Nov. 29, 1999) (Smith, J.) (concluding that environmental damage was not “about to occur” under G.L.c. 214, §7A where the development of a residential subdivision was subject to a Conservation Commission Order of Conditions designed to protect the environment).
It necessarily follows that the defendants are also entitled to summary judgment based on the plaintiffs’ undisputed failure to comply with the notice provision of §7A which provides:
No such action [by the Superior Court] shall be taken unless the plaintiffs at least twenty-one days prior to the commencement of such action direct a written notice of such violation or imminent violation by certified mail, to the agency responsible for enforcing said statute, ordinance, by-law or regulation, to the attorney general, and to the person violating or about to violate the same; provided, however, that if the plaintiffs can show that irreparable damage will result unless immediate action is taken the court may waive the foregoing requirement of notice . . .
G.L.c. 214, §7A. The City Council voted to declare the Tract surplus land on November 23, 1999. An advertisement seeking bids appeared on December 22, 1999, with the bids to be opened on January 10, 1999. In their request for a preliminary injunction, the plaintiffs alleged that the City Council would be voting to sell the Tract on or about February 8, 2000. This suit was filed on January 31, 2000. Prior notice was not given to the City, the agency responsible for enforcing whatever statute, ordinance, by-law or regulation the plaintiffs allege would be violated by the transfer, or to the attorney general. The plaintiffs have made no showing that would entitle them to waiver of the notice requirement on the basis that, if the statutory notice were required to have been given, irreparable damage would have resulted.
Further, the plaintiffs' have no reasonable expectation of proving, as required by G.L.c. 214, §7A, that the damage allegedly caused or about to be caused by the transfer constitutes a violation of a statute, ordinance, by-law or regulation, the major purpose of which is to prevent or minimize damage to the environment. See Wellfleet v. Glaze, 403 Mass. at 83. The plaintiffs contend that the City’s sale of the Tract to KAADD violates the following regulations and statutes: G.L.c. 21, §9B; the Massachusetts Clean Waters Act, G.L.c. 21, §§26-53; regulations promulgated under the Massachusetts Environmental Policy Act (MEPA), 301 Code Mass. Regs. §§11.01(2)(b)(2) and 11.03; and the Wetlands Protection Act, G.L.c. 131, §40. Chapter 21, Section 9B simply establishes the Department of Environmental Management Division of Water Pollution Control’s participation in the cooperative survey program of the United States Geological Survey for groundwater assessments and related hydrological studies'; it contains no substantive requirement that would be violated by the City’s transfer of land to KAADD. The only provision of the Massachusetts Clean Waters Act which appears to be.relevant is Section 43, which requires a permit from the Division of Water Pollution Control to discharge pollutants into waters of the Commonwealth. G.L.c. 21, §43. The mere sale of the Tract from the City to KAADD involves no such discharge and, thus, does not violate G.L.c. 21, §43. Similarly, insofar as G.L.c. 131, §40 sets forth the permitting process for any work impacting wetlands, it is not violated by the transfer of title to the Tract to KAADD.
Finally, the regulations cited by the plaintiffs under MEPA, G.L.c. 30, §§61-62H, involve the filing of an environmental survey to determine the habitat of state listed species. Although these regulations apply to a “Land Transfer,” that term is defined as “the execution and delivery by an Agency of any deed, lease, license or other document that transfers real property or an interest in real property.” 301 Code Mass. Regs. §11.02(2). The term “Agency” is defined as “any agency, board, commission, or authority of the Commonwealth” and “shall not be considered to include a Federal, municipal, or regional agency, department, board, commission or authority unless it is: 1. a municipal redevelopment agency created or acting in accordance with M.G.L.c. 121A or c. 121B; or 2. any other authority of any political subdivision of the Commonwealth that is created or acting specifically as an authority in accordance with applicable statutes.” 301 Code Mass. Regs. §11.02(2). The City’s sale of the Tract to KAADD is not a “Land Transfer” within the meaning of this regulation and does not violate MEPA. The environmental statutes and regulations cited by the plaintiffs are simply inapplicable to the transfer of title to the Tract from the City to KAADD. Whether the actual expansion of the golf course by KAADD may result in a violation by KAADD of any of these statutes or. regulations is not to be resolved in this case.
Because the plaintiffs have no reasonable expectation of demonstrating entitlement to relief under G.L.c. 214, §7A, the defendants are entitled to judgment as a matter of law on Count I of the Amended Complaint.[5]
The defendants further move for summary judgment on Count II of the Amended Complaint which alleges that the sale of the Tract to KAADD would violate Article 49 of the Amendments to the Massachusetts Constitution,[6] which provides:
The people shall have the right to clean air and water, freedom from excessive and unnecessary noise, and the natural, scenic, historic, and esthetic qualities of their environment; and the protection of the people in their right to the conservation, development and utilization of the agricultural, *506 mineral, forest, water, air and other natural resources is hereby declared to be a public purpose.
The general court shall have the power to enact legislation necessary or expedient to protect such rights.
In the furtherance of the foregoing powers, the general court shall have the power to provide for the taking, upon payment of just compensation therefore, or for the acquisition by purchase or otherwise, of land and easements or such other interests therein as may be deemed necessary to accomplish these purposes.
Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court.
The plaintiffs contend that this constitutional provision precludes the City from selling the Tract to KAADD without first obtaining the approval of two-thirds of of the Legislature.[7]
It is undisputed that, when it purchased Parcel A, the City contractually bound itself to make such land available from Parcel A to the purchaser of Parcel B as would be required to relocate golf holes or parts thereof displaced by the development of the Form A lots. Nothing in Article 49 purports to abrogate a public entity’s contractual, agreements entered into as part of the purchase agreement when land is acquired. Thus, a public entity can acquire land for the general purpose of using it for conservation purposes protected by Article 49, but obligate itselfby contract, at the time of purchase, to dispose of some portion of the land being acquired. The City’s sale, without approval of two-thirds of the Legislature, of that limited portion of Parcel A necessary to comply with its contractual obligation would not run afoul of Article 49, which seeks to preserve to the people land which was initially acquired for their benefit for conservation purposes.
The defendants’ argument that the proposed of sale of the Tract to KAADD does not run afoul of Article 49 because it simply consummates the City’s contractual obligation to sell enough land to KAADD for the relocation of the three golf holes displaced by the development of the Form A lots is belied by the record.[8] Indeed, there appears to be no genuine dispute that the purpose of the sale of the 42.5 acres at issue is to allow KAADD to expand its existing nine hole public golf course to an eighteen hole public, PGA-caliber, golf course and not merely to relocate the three displaced golf holes. It may be that the golf course cannot be expanded by KAADD without additional acreage due to the extent of wetlands on Parcel B, but the defendants have not demonstrated that the City is contractually bound to sell such land from Parcel A to the purchaser of Parcel B as would enable that purchaser to construct an eighteen hole golf course on Parcel B. Indeed, the sale of the Tract to KAADD followed a public auction, an obviously inappropriate route were the City contractually bound to convey the Tract to KAADD. Accordingly, the defendants are not entitled to judgment as a matter of law on Count II to the extent their argument is predicated upon establishing that the proposed sale of the Tract merely consummates an obligation to which the City bound itself when it purchased Parcel A.
The defendants’ argument that legislative approval is not necessary for the sale of the Tract because the City acquired Parcel A with the intent to assist in the creation of an eighteen hole golf course regardless of how much land from Parcel A it would become necessary to transfer in order to achieve that objective similarly has not been established. The record fails to demonstrate that such intent is the only inference that could be drawn from the City’s plan.[9] The objective manifestation at the time of acquisition of Parcel A of the City’s intent in acquiring this land was that the City, and not a private third party, would hold for the public enjoyment all of Parcel A except that portion necessary to relocate the three golf holes displaced by the development of the Form A lots.
The City’s argument that if the Tract is sold to KAADD, it will not be “otherwise disposed of’ within the meaning of Article 49 is unpersuasive. A sale of land ordinarily constitutes a disposition of property. The common meaning of the term “dispose of’ is “to transfer into new hands or to the control of someone else (as by selling or bargaining away).” Webster’s Third New International Dictionary (1964). See Cranberry Growers Service, Inc. v. Duxbury, 415 Mass. 354, 357 n.2 (1993) (noting that there are opinions of Attorneys General concluding that a lease is a disposition for purposes of Article 49). Compare Miller v. Commissioner of the Department of Environmental Management, 23 Mass.App.Ct. 968, 970 (1987) (concluding that the grant of a one-year seasonal permit, revocable at will, to conduct a skiing program under the supervision of the Department of Environmental Management is not a disposition of property under Article 49).
The City argues, however, that unless the phrase “otherwise disposed of’ is construed to include the concept of “used for other purposes,” the word “otherwise” is superfluous.[10] The City thus contends that “otherwise disposed of’ means only those dispositions which result in the land being used for non-Article 49 purposes. A constitutional amendment should be interpreted in light of the conditions under which it was framed and the ends which it was designed to accomplish. Mazzone v. Attorney General, 432 Mass. 515, 526 (2000). The common meaning of the word “otherwise” is “in a different way; in different circumstances; under other conditions.” Webster’s Third New International Dictionary (1964). Article 49 clearly seeks to prevent a public entity from depriving the people for whose benefit conservation land was acquired of the *507 enjoyment of that conservation land by changing its use. Article 49 also expresses the concern that disposal of protected land, i.e., the transfer of title or control of such land, is a “different way” of depriving the people for whose benefit it was acquired of its use for conservation purposes. Accordingly, the super-majority legislative approval requirement applies to any disposition of land acquired for Article 49 purposes regardless of whether, following the disposition, the land will be used by the transferee for recreational purposes. See Opinion of the Justices, 383 Mass. 895, 918 (1981) (stating that the Article 49 two-thirds voting requirement applies “to the disposition of all lands and easements taken or acquired for the stated purposes, regardless of when they were taken or acquired"). Accord, Opinion of the Attorney General, Rep. A.G., Pub. Doc. No. 12, 139, 144 (1973) (opining that the Article 49 voting requirement applies to any change in physical or legal control of protected properly, without regard to whether, after the change in control, there is the same or a different use or a consistent or inconsistent purpose in the use of the land).[11]
Finally, even if the phrase “otherwise disposed of’ were construed to require legislative approval only where, following the disposition, protected land is used for a purpose inconsistent with that for which it was acquired, the defendants have not shown that such approval is not required for sale of the Tract to KAADD. The disposition at issue involves land purchased by the City for the people to enjoy for recreational, park and conservation purposes, through their control of City government. The disposition would result in the land being transferred to a private entity for use as a profit-making golf course. Although use of a privately owned, for-profit golf course open to the public for a fee may be a recreational use in the broadest sense, the golf course will.be available for the enjoyment of the public only in exchange for payment of a fee in an amount to be determined by the private land owner. That is not the same purpose for which Parcel A was acquired. The City has not demonstrated that such use of the land is necessarily consistent with the use for which the land was acquired. Thus, the defendants are not entitled to judgment as a matter of law on Count II of the Amended Complaint.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment be ALLOWED as to Count I of the Amended Complaint and DENIED as to Count II.

 Despite the plaintiffs’ failure to file a Rule 56(f) affidavit demonstrating the need for additional time to oppose the defendants’ motion, this Court at oral argument granted the plaintiffs additional time to submit further summary judgment materials, and the plaintiffs availed themselves of that opportunity.

 It is unnecessary to address the defendants’ final contention that the change in domicile of the one of the ten plaintiffs has divested this Court of jurisdiction. See G.L.c. 214, §7A (civil action under this statute may be brought by not less than ten persons domiciled within the commonwealth). In any event, prior to any dismissal of Count I on this ground, the plaintiffs should be allowed to amend their complaint to add an additional plaintiff domiciled in the Commonwealth.

 In 1972, Article 97 of the Amendments annulled the old Article 49 of the Amendments and replaced it with the present version.

 The defendants do not dispute that Parcel A, which includes the Tract, was acquired for a public purpose protected by Article 49; rather, they contend that the proposed sale is not the kind of action which triggers the requirement that there be a two-thirds vote .of the Legislature.

 The plaintiffs’ argument that the City’s sale of 16.9 acres to KAADD on October 22, 1998 satisfied its contractual obligation to dispose of land for the relocation of three golf holes is contradicted by the affidavit of David Borque, a principal of KAADD, who states that the purpose of the October 1998 transaction was to allow KAADD to increase the distance between two of the fairways in order to enhance golfer safety.

 With respect to the City’s intent in acquiring parcel A to facilitate the development of an eighteen hole golf course on Parcel B, the Mayor’s affidavit says only that the City intended to convey the Tract to KAADD “to accomplish the City’s development plan.”

 The meaning of several statutes would not be altered were the word “otherwise” to be omitted. See, e.g., G.L.c. 21E, §5(a) (“Except as otherwise provided in this section, (1) the owner ... of ... a site from or at which there is or has been a release or threat of release of oil or hazardous material; (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material . . . shall be liable, without regard to fault, ... to the commonwealth for all costs of assessment, containment and removal incurred pursuant to section four and section eight relative to such release or threat of release . . .”); G.L.c. 258, §12 (“[c]laims against the commonwealth, except as otherwise expressly provided in this chapter or by any general or special provision of law, may be enforced in the superior court”). Indeed, in common parlance the word “otherwise” often is used when its omission would neither add nor detract from the sense of what is being communicated. See, e.g., Bombardieri v. Registrar of Motor Vehicles, 426 Mass. 371, 373-74 (1998) (‘The central issue before us is whether the DRIVE program violates G.L.c. 90, §30A. The registrar argues that the statute prohibits persons, not otherwise specifically authorized therein, from using the registry’s computer”); Cyr v. Farias, 367 Mass. 720, 724 (1975) (“Although the measure of damages in a tort action may be limited by virtue of §6D, the defendant is not otherwise exempted from tort liability since no-fault benefits are not available to the plaintiff’).

 The Opinion notes that “(t]his interpretation affords a more objective test, and is more easily applied than ‘used for other purposes,’ the standard to be applied in circumstances which cannot be characterized as a disposition — that is, when a transfer of change in physical or legal control does not occur.”