APPEALS COURT 
 
 TROY CURRENCE & others[1] vs. A.D. MAKEPEACE COMPANY & others[2]

 
 Docket:
 24-P-666
 
 
 Dates:
 May 14, 2025 – September 19, 2025
 
 
 Present:
 Sacks, Englander, & Walsh, JJ.
 
 
 County:
 Plymouth
 

 
 Keywords:
 Municipal Corporations, By-laws and ordinances, Earth removal. Jurisdiction, Damage to the environment. Real Property, Environmental damage. Statute, Construction. Limitations, Statute of. Practice, Civil, Statute of limitations, Motion to dismiss. Mandamus.
 
 

       Civil action commenced in the Superior
Court Department on August 11, 2022. 
      A motion to dismiss was heard by Michael A.
Cahillane, J., and a motion for reconsideration was considered by him.
      Margaret E. Sheehan for the plaintiffs.
      Michael R. Pontrelli for A.D. Makepeace
Company & another.
      Amy E. Kwesell for earth removal committee
of the town of Carver.
      ENGLANDER, J.  General Laws c. 214, § 7A, provides
a claim for any ten Massachusetts residents to obtain an injunction against a
person who is then causing, or is about to cause, "damage to the environment"
-- provided that the environmental damage "constitutes a violation of a
statute, ordinance, by-law or regulation the major purpose of which is to
prevent or minimize damage to the environment" (emphasis added).  The plaintiffs, ten residents and a
Massachusetts corporation, invoked c. 214, § 7A, seeking to enjoin
defendants A.D. Makepeace Company and its subsidiary Read Custom Soils LLC
(collectively, Makepeace) from continuing what the plaintiffs describe as
"commercial mining operations" at six sites in the town of Carver.  The gist of the plaintiffs' complaint is that
Makepeace has been unlawfully removing earth from these sites for over a
decade, under the guise of building cranberry bogs (or solar farms); that
Makepeace has done so either in violation of permits issued by the defendant earth
removal committee of the town of Carver (ERC), or without any permits at all;
and that these earth removal operations have caused and continue to cause
significant damage to the Commonwealth's natural resources and to the
environment.
      A Superior Court judge dismissed the
plaintiffs' complaint.  As to the
c. 214, § 7A, claim, the judge ruled that the statute did not apply
because, among other reasons, the plaintiffs' claim was based on alleged
violations of Carver's earth removal bylaw, yet "the major purpose"
of the bylaw was not to "prevent or minimize damage to the
environment."  The judge also
dismissed the plaintiffs' other claims, including a mandamus claim seeking to
require the ERC to take certain enforcement actions, as well as a purported
claim under G. L. c. 40, § 21 (17).
      As to the c. 214, § 7A, claim,
we vacate the dismissal.  In our view the
"major purpose" of the earth removal bylaw is to protect against
damage to the environment, as that term is defined in § 7A.  Land -- earth -- is a critical natural
resource, and Carver regulates earth removal activity by bylaw to protect the
use of that natural resource and to guard against the environmental effects of
such uses.  Moreover, the systematic
stripping of land from a substantial area can easily qualify as "damage to
the environment."  Nor do we
conclude (at this early stage in the proceedings) that the plaintiffs' suit is
time barred.  The c. 214, § 7A,
claim against Makepeace accordingly will go forward.  As discussed below, the remainder of the
plaintiffs' claims were properly dismissed.
      Background.  According to the complaint,[3] Makepeace is
engaged in earth removal activities in south Carver on its land, which is zoned
"Residential/Agricultural" and lies over the Plymouth-Carver sole source
aquifer, the principal source of drinking water for the area.  The complaint addresses six sites.  Three sites -- sites 4, 5, and 6 -- are
leased to a third party, Borrego Solar; these sites host completed
ground-mounted solar energy projects. 
The complaint does not allege that any earth removal is still occurring
at sites 4, 5, and 6.
      Regarding sites 1, 2, and 3, the complaint
alleges that Makepeace is currently -- and has been since as far back as 2011
-- performing substantial earth removal, despite a lack of active earth removal
permits for any of these sites.  Earth
removal in Carver is governed by Carver's earth removal bylaw, c. 9,
§ 9.1 of the town of Carver General By-laws (the bylaw).[4]  The bylaw establishes the defendant ERC, a
town board, which is empowered to issue earth removal permits.  The ERC issues permits for twelve-month
periods.  Permits may be extended up to
five years where the permit holder has provided satisfactory quarterly reports
on the project and ongoing work is performed according to the previously
approved plan; however, such a permit may not be extended beyond five years
without a public hearing.  Bylaw
§§ 9.1.4a, 9.1.7h.
      Site 1, which constitutes 535 acres and
contains already-existing cranberry bogs as well as forested areas, has been
the subject of various permits over the last decade for ever-increasing amounts
of earth removal, purportedly to create another cranberry bog that has yet to
be completed.  The plaintiffs allege that,
instead of creating this anticipated cranberry bog, Makepeace is conducting
commercial mining for sand and gravel.[5] 
The ERC last granted Makepeace an earth removal permit for site 1 in
2017 and never conducted a public hearing to extend the 2017 permit beyond five
years; therefore, the permit had expired in 2022 when the complaint was filed.
      Sites 2 and 3 are smaller, but have
similar stories.  Site 2 was permitted in
2019 for the removal of earth to create a cranberry bog reservoir, to be
completed by August of 2022.  The
reservoir has not been completed, and the permit has expired, but earth removal
continues.  Similarly, site 3 was
permitted in 2020 to create a cranberry bog and reservoir, as yet
uncompleted.  Again, the permit allegedly
has expired, but earth removal continues and, in any event, allegedly has
expanded beyond the scope of the original permit.
      In sum, the plaintiffs claim that
Makepeace's commercial mining for sand and gravel on sites 1, 2, and 3 has
resulted in the removal and stripping of soil, sand, and gravel, and the
clearing of trees, all of which are necessary to filter and protect drinking
water.  They further allege that
Makepeace has caused "permanent changes in topography and the surface
contours of [the] land," as well as "destruction, damage or
impairment . . . including but not limited to water pollution, [and]
impairment and eutrophication of . . . water resources."  Of note, the ERC permits had authorized
removal of fifty truckloads of sand and gravel per day from the three sites
over overlapping periods of time, totaling about 150 truckloads per day, six
days a week, for a period of years.[6]
      The plaintiffs also allege that the
defendant ERC is "complicit" in Makepeace's actions, because it has
failed to enforce the bylaw and the conditions of Makepeace's permits.  The complaint also alleges, more generally,
that the ERC is failing to function, and is "defunct."  The complaint does not allege, however, that
the ERC was somehow acting jointly with Makepeace.
      The plaintiffs' presuit attempts to obtain
relief are also material, as they bear on the defendants' statute of
limitations defenses, as well as the plaintiffs' obligation to give twenty-one
days' notice before filing suit under c. 214, § 7A.  The instant suit was filed on August 11,
2022.  Persons associated with the
plaintiffs first sent a demand to the ERC over one year earlier, in April of
2021, and again in May and June of 2021. 
The June 2021 demand letter[7] was a "[d]emand for
[e]nforcement" of the earth removal bylaw; although that demand letter references
the three solar energy sites (sites 4, 5, and 6), it does not specifically
reference sites 1, 2, and 3, nor does it reference c. 214, § 7A.  The June 2021 letter also reveals that
persons associated with the plaintiffs met with the ERC in April of 2021, after
the initial demand, and that on June 1, 2021, an attorney for the town
responded by letter formally declining to take enforcement action against
Makepeace.
      The plaintiffs did not file suit in
2021.  Rather, on August 9, 2021, and
again on March 15, 2022, new demand letters were sent to the town, this time
specifying c. 214, § 7A, and stating that the demands were sent on
behalf of ten taxpayers.  These two
c. 214, § 7A, demand letters described allegedly unlawful and
unpermitted "commercial mining operations" of Makepeace, much as are
alleged in the complaint.  The complaint
alleges that the ERC ignored and did not respond to these later demands.
      Under c. 214, § 7A, the
plaintiffs must provide notice "at least twenty-one days" prior to
bringing suit.  As indicated, the
complaint was filed on August 11, 2022, 149 days after the March 15, 2022,
demand.  In their complaint, the
plaintiffs sought (1) an injunction under G. L. c. 214, § 7A, to
enjoin Makepeace from continuing earth removal allegedly in violation of the
bylaw; (2) mandamus under G. L. c. 249, seeking to order the ERC to
require Makepeace to cease and desist earth removal and to restore the
property, as well as to order the ERC to issue penalties for violations of the
bylaw; (3) a declaratory judgment under G. L. c. 231A, declaring
among other things that all earth removal permits issued by the ERC to
Makepeace are expired and therefore void; and (4) for enforcement of the bylaw,
pursuant to G. L. c. 40, § 21 (17).
      A Superior Court judge ultimately
dismissed the complaint in its entirety.[8] 
With regard to the claim under c. 214, § 7A, the judge
concluded that the major purpose of the earth removal bylaw was not to prevent
or minimize damage to the environment and thus that c. 214, § 7A, did
not apply; the judge also held, as additional grounds for dismissal, (1) that
claims related to sites 4, 5, and 6 were moot as no earth removal was then
"occurring or about to occur,"[9] (2) that the ERC was not a proper
defendant under the statute, and (3) that at least some claims were time barred
because more than sixty days had passed since the permits for sites 1, 2, and 3
were issued.  As to the other claims, the
judge ruled that mandamus was not available to order the ERC to take
enforcement actions because the ERC was given broad discretionary authority to
issue and extend permits and to monitor earth removal activity, and that
G. L. c. 40, § 21, does not provide a right of action to private
individuals.  This appeal followed.
      Discussion.  1. 
General Laws c. 214, § 7A. 
The plaintiffs' principal argument is that the judge erred in dismissing
their claim under c. 214, § 7A. 
That statute states in pertinent part,
"The
superior court for the county in which damage to the environment is occurring
or is about to occur may, upon a civil action in which equitable or declaratory
relief is sought in which not less than ten persons domiciled within the
commonwealth are joined as plaintiffs, . . . restrain the person
causing or about to cause such damage; provided, however, that the damage
caused or about to be caused by such person constitutes a violation of a
statute, ordinance, by-law or regulation the major purpose of which is to
prevent or minimize damage to the environment."
G. L.
c. 214, § 7A.
      An action under § 7A is for injunctive
relief or declaratory relief only; it is not an action for damages.  To prevail, the plaintiffs must be at least
ten persons[10] domiciled within the Commonwealth and must show  
(1) "damage
to the environment"
(2) "is
occurring or is about to occur,"
(3) that the
damage to the environment "constitutes a violation of a statute,
ordinance, by-law or regulation,"
(4) that the
"major purpose" of the statute, ordinance, bylaw, or regulation so
violated is "to prevent or minimize damage to the environment," and
(5) that the
defendant is the "person causing or about to cause such damage."
      The above statutory language raises a host
of interpretative issues that are relevant to the defendants' motion to
dismiss.  We will begin, however, with
the first issue that the judge considered dispositive, which is whether the
"major purpose" of the Carver earth removal bylaw is to prevent or
minimize damage to the environment.  The plaintiffs'
theory under § 7A is that Makepeace was violating the earth removal bylaw
by removing earth either without a permit or beyond the scope of its permits,
that as to sites 1, 2, and 3 those violations were continuing
("occurring"), and that the major purpose of the earth removal bylaw
is to prevent environmental damage.  The
judge concluded, to the contrary, that the major purpose of the bylaw is not to
protect against damage to the environment, but to ensure safe earth removal and
"that the land is left in a safe condition."  We do not agree.
      a. 
The alleged damage constitutes damage to the environment.  A threshold question is whether the various
harms that the plaintiffs allege from the earth removal qualify as "damage
to the environment" under § 7A. 
The statute expressly defines "damage to the environment" --
it is "any destruction, damage or impairment, actual or probable, to any
of the natural resources of the commonwealth."  G. L. c. 214, § 7A.  Although the term "natural
resources" is not further defined,[11] the Commonwealth's Department of
Natural Resources, as in existence when the statute was first enacted,[12] see
St. 1971, c. 732, § 1, defined natural resources as including
"forests and all uncultivated flora . . . ; land, soil and
soil resources, lakes, ponds, streams, coastal, underground and surface waters;
minerals and natural deposits" (emphasis added).  G. L. c. 21, § 1, as amended
through St. 1968, c. 736, § 1. 
And the Department of Conservation and Recreation's current definition
of "natural resources" includes the same language.  See G. L. c. 21, § 1.
      The various types of damage alleged in the
complaint certainly qualify as damage to the environment under the above
definition.  Leaving aside the
complaint's allegations about the town aquifer and water pollution (which also
qualify), the alleged damage to the land and soil resources itself qualifies as
damage to the Commonwealth's natural resources. 
There can be little doubt that the systematic stripping of earth and
topsoil -- not to mention tree removal, leading to increased exposure to
erosion -- constitutes damage to "soil resources."[13]
      The statute itself has been described as
"broad" in purpose.  See Boston
v. Massachusetts Port Auth., 364 Mass. 639, 646 (1974) (statute's "broad
statements of purpose are incompatible with a narrow, technical
interpretation" that would limit enforcement).  Indeed, the legislative history contemplates
the statute as addressing "wider targets, larger aims" and acting as
"another weapon in [the] anti-pollution arsenal."  1971 House Doc. No. 5023.  With that in mind and taking the allegations
of the complaint as true, the plaintiffs have adequately alleged that damage to
the environment is occurring or about to occur at sites 1, 2, and 3.  See Curtis v. Herb Chambers I-95, Inc., 458
Mass. 674, 676 (2011); Iannacchino v. Ford Motor Co., 451 Mass. 623, 636
(2008).
      b. 
The bylaw's "major purpose" is to protect the
environment.  We also conclude that the
"major purpose" of the earth removal bylaw is to prevent or minimize
such "damage to the environment." 
General Laws c. 214, § 7A, does not give much direction as to
how to evaluate "the major purpose" of a "statute, ordinance,
by-law or regulation," nor does the prior case law.  The question presents as a question of law,
for the courts to decide.  The use of the
word "the" before "major purpose" indicates that there can
be only one; we may not conclude that preventing damage to the environment is
one of several "major purposes" of the bylaw.
      The bylaw at issue is published by the
town of Carver along with its other bylaws, in a sort of compendium.  It appears in chapter 9, titled
"Environment," and it is bylaw § 9.1, "Earth Removal."[14]  The bylaw has a stated "purpose,"
which is 
"to promote
the health, safety, and general welfare of the residents of the Town of Carver,
and to ensure that permanent changes in the surface contours of land resulting
from the removal and regrading of earth materials will leave the land in a safe
and convenient condition for appropriate reuse without requiring excessive and
unreasonable maintenance or creating danger of damage to public and private
property, as well as to provide that earth removal activities shall be
conducted in a safe manner and with minimal detrimental effect upon the
district in which the activities are located."
Bylaw
§ 9.1.1.
      The basic provisions of the bylaw are (1)
it establishes the ERC, (2) it provides that no earth shall be removed in the
town of Carver without a permit from the ERC, and (3) it requires an
application to remove earth and a site plan with various details, including
land contours before, during, and after, the locations of water bodies, surface
water flows, and ground water impacts. 
Notably, the site plan "shall also show a fully complete
restoration plan" that complies with sound engineering practices and
natural resource conservation standards. 
Bylaw § 9.1.5c.  In granting
or denying the permit, (4) the ERC "shall determine that the proposal
generally conforms to the principles of good engineering, sound planning,
correct land use, and provides for the proper and reasonable reuse of available
topsoil if appropriate."  Bylaw
§ 9.1.7a.
      The Superior Court judge concluded that
"the major purpose of the [b]ylaw is to ensure that earth removal is
conducted in a safe manner and that the land is left in a safe condition
following earth removal, not to prevent or minimize damage to the
environment."  We do not agree that
the bylaw's purpose is narrowly confined to public safety concerns, or that
such public safety concerns are the "major purpose" of the
bylaw.  Rather, the above review shows
that the earth removal bylaw is fundamentally about protecting and preserving a
basic natural resource -- earth.  The
bylaw requires review and permitting of earth removal, consideration of the various
environmental impacts, and a "fully complete restoration plan" that
complies with natural resource conservation standards.  Bylaw § 9.1.5c.  See Bylaw §§ 9.1.4a, 9.1.5a.  The bylaw thus is initiated and permeated by
concerns about the environment.  While
public safety is a concern, public safety is not the "major purpose"
where the bylaw requirements extend far beyond public safety.[15]
      Our conclusion is consistent with the
genesis of such earth removal regulations. 
"Historically, earth removal regulation was initiated to curb the
effects of the uncontrolled stripping away of topsoil and other earth
materials."  Toda v. Board of
Appeals of Manchester, 18 Mass. App. Ct. 317, 320 n.8 (1984).  In Beard v. Salisbury, 378 Mass. 435, 439
(1979), the Supreme Judicial Court addressed a local earth removal bylaw in a
different context, but while doing so observed that such regulation is directed
at "the deleterious effects brought about by unrestrained earth
removal."  The court quoted at
length from its prior opinion in Burlington v. Dunn, 318 Mass. 216, 221, cert.
denied, 326 U.S. 739 (1945):
"The
stripping of the top soil from a tract of land is not only likely to produce
disagreeable dust and noise during the process, which may be prolonged, but,
more important, after it is completed it leaves a desert area in which for a
long period of time little or nothing will grow except weeds and brush.  It permanently destroys the soil for
agricultural use and commonly leaves the land almost valueless for any purpose."
Beard, supra at
439 n.8.
      In short, consistent with historical
purposes, Carver's bylaw has as its major purpose the protection against damage
to the environment.  Nothing in the case
law discussing the "major purpose" requirement of c. 214,
§ 7A, suggests a contrary result. 
The only case previously to address that language in any depth is
Wellfleet v. Glaze, 403 Mass. 79, 83 (1988). 
In that case, the town of Wellfleet invoked c. 214, § 7A, in
an effort to prohibit the defendant from mooring his boats over (and on) tidal
flats that Wellfleet had licensed to third parties to plant, grow, and take
shellfish.  See id. at 80-82.  Wellfleet claimed that the defendant's
actions violated G. L. c. 130, § 67, which imposed penalties for
interference with licensed shellfishing, provided the interference was
"without the consent of the licensee."  See id. at 81 & n.4.  The court concluded that the major purpose of
c. 130, § 67, was not to prevent or minimize damage to the
environment, because the statutory sanctions depended on whether the licensee
had consented to the interference; if the Legislature "was primarily
motivated by a desire to protect the natural resources of the Commonwealth, it
surely would not have limited the statutory sanction only to acts done without
the licensee's permission." 
Wellfleet, supra at 83.  The
Wellfleet case is plainly distinguishable from this one, because here the earth
removal bylaw applies generally to earth removal in Carver, and its enforcement
is not dependent on the desires of a private individual.  See Ten Persons of the Commonwealth v.
Fellsway Dev. LLC, 460 Mass. 366, 379 n.24 (2011) (chapter 214, § 7A,
did not apply to alleged violations of statute "that delineates the broad
authority of various agencies to construct, maintain, and acquire roadways and
boulevards"; statute does not have major purpose to prevent or minimize
environmental damage).
      c. 
The "person causing" the environmental damage.  The next question is who is a proper
defendant in a c. 214, § 7A, claim. 
The statute provides an injunctive remedy against "the person
causing" the environmental damage. 
Here that person is clearly Makepeace, the entity conducting earth removal.
      The same is not true for the defendant
ERC, however.  The ERC is not removing earth,
and it accordingly is not taking the action that is allegedly damaging the
environment.  The plaintiffs claim that
by failing to act in its regulatory capacity the ERC is complicit in
Makepeace's damage, but c. 214, § 7A's causation requirement does not
encompass a claim against a government body for failing to enforce
environmental regulations.  Thus, in
Cummings v. Secretary of the Executive Office of Envtl. Affairs, 402 Mass. 611,
614-617 (1988), the Supreme Judicial Court held that a c. 214, § 7A,
claim would not lie against the Secretary of Environmental Affairs for failing
to require an environmental impact report. 
The court concluded that the statute's language "suggests
. . . that the Legislature contemplated only the agency or authority
or private person proposing a project, and not the public official who
administers the statutory scheme, as 'the person causing or about to cause'
environmental damage."  Cummings,
supra at 616, quoting G. L. c. 214, § 7A.  While the statute does apply where the
government agency is itself the actor damaging the environment, see Boxford v.
Massachusetts Highway Dep't, 458 Mass. 596, 603-604 (2010), it does not apply
to an agency whose only participation is as a regulatory body.  The situation might be different if the
government agency were plausibly alleged to be a joint venturer or conspirator
together with the primary actor, but that is not what is alleged here.  Accordingly, the c. 214, § 7A,
claim against the ERC was properly dismissed.
      d. 
The statute of limitations. 
Makepeace also argues that the plaintiffs' claims are barred by a
sixty-day statute of limitations, which Makepeace purports to borrow from the
statute of limitations applicable to actions for certiorari.  See G. L. c. 249, § 4.  The theory is that the plaintiffs' claims are
actually challenging the issuance of the permits by the ERC, that such
issuances are challengeable by certiorari, and that c. 214, § 7A, is
not a vehicle to avoid the applicable statute of limitations.
      If the plaintiffs' claims were limited to
challenging the issuance of the ERC permits, we might well agree that the
sixty-day limitations period applies. 
There is authority suggesting that the limitations period applicable to
a c. 214, § 7A, claim is the period that would apply to challenging a
violation of the statute, ordinance, bylaw, or regulation at issue.  See Miramar Park Ass'n, Inc. v. Dennis, 480
Mass. 366, 375 n.9 (2018).  Compare Canton
v. Commissioner of the Mass. Highway Dep't, 455 Mass. 783, 794-795 (2010).  But the plaintiffs' claims are not limited to
challenging the issuance of permits.  As
to Makepeace, the plaintiffs claim that it is operating without permits, or
beyond the scope of the issued permits, and that those bylaw violations are
ongoing.
      We cannot conclude on this record that the
plaintiffs' claims are time barred.  In
addressing this question, we first have to decide a thorny legal question,
which is what statute of limitations should apply to the plaintiffs'
c. 214, § 7A, claim -- if any -- under these circumstances.  Section 7A requires that the plaintiffs
notify the agency responsible for enforcing the bylaw, here the ERC, "at
least twenty-one days" before filing suit. 
If as here the agency fails to act after notice, how long should the ten
taxpayers then have to bring their complaint? 
Such plaintiffs essentially seek to stand in the shoes of the government
enforcement authority.  One place to look
for guidance would be whether there is any limitation on how long the
government has to act with respect to a bylaw violation.  Here, however, the earth removal bylaw does
not provide any deadline by which the ERC must act to enforce.  Moreover, by definition, under c. 214,
§ 7A, the plaintiffs must be challenging ongoing or imminent damage to the
environment, so at least some of the common concerns animating statutes of
limitation, such as staleness or the unavailability of witnesses, may not
apply.  These various considerations
speak against a tight filing deadline, such as the sixty days proposed by the
defendants.  Cf. Worcester v. Gencarelli,
34 Mass. App. Ct. 907, 908 (1993) (two-year statute of limitations for claims
under G. L. c. 131 did not apply to c. 214, § 7A, claim by
city, where claimed filling of wetland "is a continuing violation").  And where ongoing environmental damage is at
issue and the government has been notified and not acted, it is not clear why
the public (the ten taxpayers) should be precluded from filing -- unless the
delay is unreasonable, such that a new notice to the responsible government
agency should be required.  Balancing
these various considerations, we conclude that a delay in filing suit of less
than six months likely would not be unreasonable.
      Here the delay was 128 days after the
twenty-one-day notice period had passed. 
We cannot say that this delay was unreasonable as a matter of law.[16]
      2. 
Mandamus.  The plaintiffs also
sought relief in mandamus under G. L. c. 249 to compel the ERC, among
other things, to enforce the bylaw and to issue penalties for every violation
established.  The judge dismissed this
claim, reasoning that mandamus was not available where the plaintiffs were
seeking to compel the ERC to perform a discretionary act.  We agree.
      The law is clear that mandamus is only
available to compel a government official to perform acts that do not involve a
significant exercise of discretion.  See
Boxford, 458 Mass. at 606.  The decision
whether to initiate a government enforcement proceeding historically has been
viewed as just such a discretionary decision. 
See id. (mandamus claim dismissed where agency possesses broad
discretion "to act through regulations, through specific orders, or not to
act at all").  Indeed, the
discretionary nature of such decisions was recognized years ago by the United
States Supreme Court in Heckler v. Chaney, 470 U.S. 821, 831-832 (1985), when
it held that administrative decisions not to take enforcement action were
generally unsuitable to judicial review and thus presumptively unreviewable in
the Federal courts.[17]  See Commonwealth
v. Boston Edison Co., 444 Mass. 324, 334 (2005) ("the proper exercise of
enforcement discretion . . . is not ordinarily judicially
reviewable").
      It is possible that a particular law at
issue could be sufficiently directive and unequivocal that an agency might have
no discretion but to take an identified enforcement step, in which case
mandamus might be available.  "In
the absence of an alternative remedy, relief in the nature of mandamus is
appropriate to compel a public official to perform an act which the official
has a legal duty to perform." 
Lutheran Serv. Ass'n of New England, Inc. v. Metropolitan Dist. Comm'n,
397 Mass. 341, 344 (1986).  See
Massachusetts Soc'y of Graduate Physical Therapists, Inc. v. Board of
Registration in Med., 330 Mass. 601, 603-606 (1953) (mandamus proper remedy
where board required by statute to register certain applicants and instead
refused registration).  Cf. Brady v.
Board of Appeals of Westport, 348 Mass. 515, 519-522 (1965) (mandamus proper
remedy to compel local official to enforce zoning bylaw).  But that is not this case.  Here there is no such clear directive in the
bylaw.  Among other things, the
enforcement section of the bylaw predicates enforcement on whether the ERC
"believes" that there is a violation of approved plans, or
"believes" that the conditions on a premises "constitute a
nuisance or public danger."  Bylaw
§ 9.1.9a.  As the mandamus claim seeks
to compel a discretionary act, it fails as a matter of law.
      3. 
Enforcement of the bylaw.  The plaintiffs
also purported to state a claim under G. L. c. 40,
§ 21 (17), seeking to have the court enter an order directly
enforcing the bylaw.  General Laws
c. 40, § 21, authorizes towns to make ordinances and bylaws, and to
"affix penalties for breaches thereof."  It accordingly is directed to providing
certain legislative authority to towns, as well as the authority for towns to
enforce what they have prohibited or required. 
Paragraph 17 of c. 40, § 21, specifically authorizes bylaws as
to earth removal, and grants the Superior Court "jurisdiction in equity to
compel compliance with any ordinance or by-law."
      The judge dismissed this claim on the
ground that G. L. c. 40, § 21 (17), does not provide a
private right of action -- that is, it provides for towns to take enforcement
actions, but not private individuals.  We
agree.  "The question whether a
statute creates a cause of action, either expressly or by implication, is basically
a matter of statutory construction." 
Unitrode Corp. v. Dynamics Corp. of Am., 379 Mass. 487, 491 (1980),
quoting Transamerica Mtge. Advisors, Inc. v. Lewis, 444 U.S. 11, 15
(1979).  "We will not construe a
statute to establish a private right of action without express terms or clear legislative
intent to that effect."  Nordberg v.
Commonwealth, 96 Mass. App. Ct. 237, 239 (2019).  We do not construe c. 40,
§ 21 (17), as providing for private enforcement of the local bylaws
that are there authorized.  Compare
Fratus v. Harwich, 100 Mass. App. Ct. 27, 28-30 (2021) (no private right of
action for citizen seeking to enforce statute requiring road repairs).
      4. 
Declaratory judgment.  The
plaintiffs also sought declaratory judgment under G. L. c. 231A.  However, the plaintiffs have not identified
any legal right as to which the court may make a declaration, other than that
provided to them as a ten residents group under c. 214, § 7A.  Accordingly, the plaintiffs' request for a
declaratory judgment is only viable as a remedy potentially available to them
under c. 214, § 7A.[18]  See
Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 589 (2024).  This c. 231A count does not state a
separate claim, and was properly dismissed.
      Conclusion.  As against the defendants, A.D. Makepeace
Company and Read Custom Soils LLC, we vacate so much of the judgment as
dismisses the plaintiffs' complaint seeking declaratory and injunctive relief
under G. L. c. 214, § 7A, as to sites 1, 2, and 3.  We affirm the judgment in all other respects.  The case is remanded to the Superior Court
for further proceedings consistent with this opinion.[19]
So ordered.

footnotes

[1] Tony
Ferretti, Jeannine Hunt, Camille Madison, Linda Coombs, Wendy O'Brien, Kathleen
Pappalardo, Jeffrey Landry, Rebecca Lipton, Dorothy Pollitt, and Save the Pine
Barrens, Inc.

[2] Read Custom
Soils LLC and the earth removal committee of the town of Carver.

[3] We
"accept[] as true all well-pleaded facts alleged in the complaint, drawing
all reasonable inferences therefrom in the plaintiff's favor, and determining
whether the allegations plausibly suggest that the plaintiff is entitled to
relief."  See Lanier v. President
& Fellows of Harvard College, 490 Mass. 37, 43 (2022).
      The complaint was filed in 2022.  This opinion reviews the order of a Superior
Court judge, which was based on the facts alleged in the complaint.  Our opinion is also based on those
allegations, which are the facts of record. 
We recognize that the facts on the ground may now be different.

[4] We cite the
2021 version of the bylaw that was in effect when this litigation commenced.

[5] The complaint
additionally alleges that Makepeace has been operating Read Custom Soils LLC
(Read), its subsidiary and a named defendant in the present action, on site
1.  Read purportedly receives materials
from other earth removal sites for blending, processing, sales, and
distribution.  When the complaint was
filed in 2022, Read's website stated, "We operate from a state-of-the-art
blending facility in Carver, Massachusetts (located in the heart of our
enormous reserves of USGA quality sand)."

[6] The
plaintiffs also claim "impairment of the interest in the natural resources
and archeological history of the Commonwealth."  Specifically, sites 1 and 3 may contain
evidence of archeological significance pertaining to ancient Native American
land use.

[7] Copies of the
April 2021 and May 2021 demands are not in the record.

[8] Initially,
the Superior Court judge treated the defendants' motion to dismiss as a motion
for summary judgment, and he allowed it. 
On reconsideration, the judge vacated the summary judgment and instead
allowed the defendants' motion to dismiss.

[9] The
plaintiffs now concede that the work at the solar farms on sites 4, 5, and 6 is
completed.  Because c. 214,
§ 7A, provides only injunctive relief to prevent or to minimize damage
occurring or about to occur, dismissal was appropriate as to these sites, where
earth removal activities may have occurred but are no longer occurring.  See Nantucket Land Council, Inc. v. Planning
Bd. of Nantucket, 5 Mass. App. Ct. 206, 214-215 (1977).  The three cranberry bogs and reservoirs
(sites 1, 2, and 3) are the only sites now at issue.

[10] Makepeace
argues that the plaintiffs no longer constitute ten persons, noting that one of
the named individuals died prior to appeal. 
Makepeace is incorrect, because the complaint identified eleven persons
as plaintiffs:  ten individuals and a
Massachusetts nonprofit corporation.  See
G. L. c. 214, § 7A ("person" includes "any
individual, association, partnership, corporation, company, business
organization, trust, estate").  The
death of one individual plaintiff between the trial court proceedings and the
filing of this appeal accordingly would not impact the "ten person"
requirement, even if we were to assume (which we do not) that the death of a
named plaintiff would vitiate standing under the circumstances.

[11] The statute
does, however, provide several nonexclusive examples of environmental damage,
including "air pollution, water pollution, improper sewage disposal,
pesticide pollution, excessive noise, improper operation of dumping grounds,
impairment and eutrophication of rivers, streams, flood plains, lakes, ponds or
other water resources, destruction of seashores, dunes, wetlands, open spaces,
natural areas, parks or historic districts or sites."  G. L. c. 214, § 7A.

[12]
"[General Laws] c. 214, § 10A (repealed), the predecessor of
c. 214, § 7A, and like it in all material respects," was first
introduced in 1971.  Cummings v.
Secretary of the Executive Office of Envtl. Affairs, 402 Mass. 611, 614, 626
(1988).  See St. 1971, c. 732,
§ 1.  See also Sierra Club v. Commissioner
of the Dep't of Envtl. Mgt., 439 Mass. 738, 739 n.3 (2003) (General Laws
c. 214, § 10A [repealed], "now appears as § 7A" after
"c. 214 was reorganized in 1973").

[13] Of course,
de minimis earth removal would not qualify. 
General Laws c. 214, § 7A, states that damage to the
environment "shall not include any insignificant destruction, damage or
impairment to such natural resources."

[14] Following
the renumbering of the Carver bylaws in 2024, after this litigation commenced,
the earth removal bylaw was given its own chapter; there is no longer a chapter
titled "Environment."  See c.
136 of the Code of the Town of Carver (2024).

[15] We do not
mean to suggest that "public safety" concerns fall in a separate
category from environmental concerns. 
The two often overlap. 
Environmental regulation is of course a subset of regulation directed at
"health, safety, and general welfare," Bylaw § 9.1.1, and
environmental protections are often animated by public safety concerns.  The statute, however, directs us to determine
the "major purpose" of the bylaw, and here it is not limited just to
public safety.

[16] We note that
there is a further issue raised by the allegations here, which is whether
Makepeace can be liable under c. 214, § 7A, as to any actions it
takes that are authorized by permit (as opposed to being unpermitted or beyond
the scope of any permit).  To violate
c. 214, § 7A, the environmental damage must "constitute[] a
violation of . . . [the] by-law" at issue.

[17] The Heckler
court explained,  
"The reasons
for this general unsuitability are many. 
First, an agency decision not to enforce often involves a complicated
balancing of a number of factors which are peculiarly within its expertise.  Thus, the agency must not only assess whether
a violation has occurred, but whether agency resources are best spent on this
violation or another, whether the agency is likely to succeed if it acts,
whether the particular enforcement action requested best fits the agency's
overall policies, and, indeed, whether the agency has enough resources to
undertake the action at all.  An agency
generally cannot act against each technical violation of the statute it is
charged with enforcing.  The agency is
far better equipped than the courts to deal with the many variables involved in
the proper ordering of its priorities."
Heckler, 470 U.S.
at 831-832.

[18] The
declaratory relief that the plaintiffs seek under the heading of their
c. 231A claim may instead be sought in the context of their c. 214,
§ 7A, claim, but we express no view on whether any of the specific
declarations they seek is available, as those issues have not been briefed.

[19] Defendants
A.D. Makepeace Company and Read Custom Soils LLC's request for attorney's fees
is denied.